**The below described is SIGNED.**

**Dated: March 23, 2007**

_William T. Thurman_

**WILLIAM T. THURMAN**
**U.S. Bankruptcy Judge**



---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

---

| | |
|---|---|
| In re: | |
| **George Love Farming, LC,** | Bankruptcy Number 06-20612 |
| Debtor. | Chapter 7 |

---

### MEMORANDUM DECISION DENYING DEBTOR'S MOTION TO CONVERT

---

The matter before the Court is the Debtor's Motion to Convert to chapter 11 of the

Bankruptcy Code. The Debtor is one of five entities which were substantively consolidated in a

separate chapter 11 case. Although the chapter 11 case is still pending, the Debtor commenced

this chapter 7 case alone, and the Debtor now seeks to convert this case to chapter 11. The U.S.

Trustee, the chapter 7 Trustee, and two secured creditors objected, arguing that the Debtor is

attempting to convert this case in bad faith. The Court agrees.

### I.    JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and

157(b)(2)(A). Venue is appropriate under 28 U.S.C. § 1408(1).

## II.    BACKGROUND

This case is complicated.  For purposes of this Memorandum Decision, the Court

believes it essential to discuss how this case has developed.

On October 12, 2004, Snowville Farms, LLC and Mr. George Love commenced separate

chapter 11 bankruptcy cases.  On March 3, 2004, the Court *sua sponte* ordered the appointment

of an examiner for the bankruptcy estates of Snowville Farms, LLC and Mr. Love to investigate

whether they should be substantively consolidated with the assets and liabilities of several non-

debtor entities owned or controlled by Mr. Love.  The examiner conducted a lengthy

examination of Mr. Love and his related entities, and filed an Initial Report and

Recommendation on April 15, 2005.[1]  Through his Initial Report, the examiner made the

following findings:

- Historically, Mr. Love paid very little attention to the form within which he operated these businesses.[2]
- George Love Farming Partnership presently has no assets, liabilities, or operations.[3]
- In theory, Snowville Farms, LLC is one of the owners of the land comprising the Farm, but has no operations.  In practice, some of the Farm's operations are still conducted using Snowville's name.[4]

---

[1]The Initial Report was not offered into evidence at the hearing in this matter, but the Court has authority to take judicial notice of its own records, and does so with respect to the Initial Report. St. Louis Baptist Temple, Inc. V. Federal Deposit Insurance Corp., 605 F.2d 1169, 1172 (10th Cir. 1979).

[2]Initial Report and Recommendation of Examiner at ¶ 27, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[3]Initial Report and Recommendation of Examiner at ¶ 30, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[4]Initial Report and Recommendation of Examiner at ¶ 31, Snowville Farms, LLC, 04-36559 (Docket No. 260).

- Each of the Related Persons and Entities[5] shares a common business address — Mr. Love's residence, which contains a single home office.[6]
- Neither Snowville Farms, LLC nor the George Love Farming Partnership LC has any employees.[7]
- All of the Related Persons and Entities use the same computer accounting system.[8]
- Although the livestock and equipment used in the Farm operation is nominally owned by George Love Farming LC, it is maintained by employees of George Love Family Partnership, and the insurance for the property is paid by Snowville Farm, LLC's bank account.[9]
- The Farm Group has been operated as one entity. Mr. Love only considers the Farm Group as separate entities for tax and accounting purposes. Mr. Love also stated in his examination by Aegon that the Farm Group really does not have an independent existence.[10]
- In theory, title to all the equipment used in the Farm operations is in the name of George Love Farming, LC. In reality, the evidence is mixed. There is evidence that some farm equipment is owned by Mr. Love and Snowville Farms, LLC.[11]
- Mr. Love maintains computer records of the vendors of the Farm Group. The list is maintained on a consolidated basis; there is no separation of vendors by the entities comprising the Farm Group.[12]

---

[5]The Initial Report defined "Related Persons and Entities" as Mr. Love, Mrs. Love, Snowville Farms, LLC, George Love Farming LC, George Love Family Partnership, JFS Food Services, Lc, and George Love Construction, Inc.

[6]Initial Report and Recommendation of Examiner at ¶ 44, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[7]Initial Report and Recommendation of Examiner at ¶ 45, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[8]Initial Report and Recommendation of Examiner at ¶ 50, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[9]Initial Report and Recommendation of Examiner at ¶ 52, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[10]Initial Report and Recommendation of Examiner at ¶ 53, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[11]Initial Report and Recommendation of Examiner at ¶ 63, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[12]Initial Report and Recommendation of Examiner at ¶ 67, Snowville Farms, LLC, 04-36559 (Docket No. 260).

- It appears that creditors of the Farm Group dealt with the Farm Group as a single economic unit.[13]
- Mr. Love is personally liable on most of the debts of the Farm Group.[14]
- The Farm Group[15] maintains a single bank account in the name of Snowville Farms, LLC. Thus, the George Love Family Partnership, George Love Farming LC, and the George Love Farming Partnership do not have bank accounts. Moreover, the source of the George Love Family Partnership's start up capital was funds from Snowville Farms, LLC's account. All revenues of the Farm operations are paid into this single account to pay the combined bills of the Farm Group.[16]
- Mr. Love and Mrs. Love have sometimes used the Farm Group's account as their personal piggy-bank.[17]

On the basis of these findings, the examiner recommended the substantive consolidation of Mr. Love, Snowville Farms, LLC, George Love Farming LC, George Love Farming Partnership, and George Love Family Partnership.

While the examiner was preparing his report, Snowville Farms and Mr. Love filed a Motion to Substantively Consolidate the bankruptcy estates of Snowville Farms and Mr. Love with the assets and liabilities of George Love Farming, LC, George Love Farming Partnership, and the George Love Family Partnership.[18]   The Court held a hearing on the Substantive

---

[13]Initial Report and Recommendation of Examiner at ¶ 68, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[14]Initial Report and Recommendation of Examiner at ¶ 71, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[15]The Initial Report defined the "Farm Group" as Snowville Farms, LLC, George Love Family Partnership, and George Love Farming LC.

[16]Initial Report and Recommendation of Examiner at ¶ 75, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[17]Initial Report and Recommendation of Examiner at ¶ 90, Snowville Farms, LLC, 04-36559 (Docket No. 260).

[18]The initial Motion did not seek to include the bankruptcy estate of Mr. Love in the Substantively Consolidated estate. At the hearing on the Motion, however, Mr. Love and Snowville Farms, LLC orally modified their Motion to include Mr. Love's bankruptcy estate.

Consolidation Motion and considered the examiner's Report on April 21, 2005.  Relying in part

on the examiner's thorough report and recommendation to which there were no objections, and

after receiving evidence and hearing oral arguments, the Court granted the Motion.  On May 15,

2005, the Court issued an Order Substantively consolidating the bankruptcy estates of George

Love Farming LC, George Love Farming Partnership, George Love Family Partnership, Mr.

George Love, and Snowville Farms LLC into case no. 04-36559 (the "Consolidated Estate").

The Substantive Consolidation Order specifically purported to consolidate "all assets and

liabilities" of the bankruptcy estates discussed above.[19]

    The primary assets of the consolidated estate were two large farming properties: one dry

farm (the "Dry Farm") and one irrigated farm (the "Sanda Rosa Farm").  Both farms are located

in northern Utah and for the past several years have been used to grow organic wheat and alfalfa

crops.  Since the inception of the Consolidated Case, Mr. George Love has operated a farming

operation on the Dry Farm and the Sanda Rosa Farm as a member and principal of the

Consolidated Estate.

    On December 12, 2005, the Court confirmed a chapter 11 plan for the Consolidated

Estate which provided a specific and detailed payment schedule to be made to various secured

creditors.  The plan provided Barnes Bank a claim for $673,949.55 plus interest, fees, and costs,

secured by all crop related receivables, the 2004 harvested wheat remaining in bins, in all 2005

future year crops, and in government assistance payments.  The plan also provided Life Investors

Insurance Company of America ("LIICOA") a claim for $7,011,910.97, secured by the two

---

[19]The Substantive Consolidation Order was drafted and submitted for the Court's
approval by counsel for Snowville Farms, LLC and by counsel for Mr. George Love.

farms and by a second position lien on all crop-related accounts receivable and proceeds from

2005 crops.  Under the terms of the plan, the Consolidated Debtors were required to pay Barnes

$550,000 by December 30, 2005 and was required to pay LIICOA $320,000 by January 20,

2006.   The Consolidated Debtors commenced making payments to all creditors under the

confirmed plan except Barnes and LIICOA.  It failed to pay Barnes on December 30, and failed

to pay LIICOA on January 20.  In response, Barnes Bank and LIICOA attempted to exercise

their rights under the plan by scheduling foreclosure sales on their collateral.

In an attempt to avoid foreclosure, the Consolidated Debtors filed a Motion to Amend the

Plan of Reorganization on January 26, 2006. The Motion sought to require Barnes and LIICOA

to subordinate their security interests to the federal government so that the Debtor could fund its

plan with an FSA loan.  After an evidentiary hearing, the Court denied the Motion to Modify,

finding that the Debtor had already substantially consummated its plan of reorganization.  On

February 14, 2006, the Consolidated Debtors filed a Motion to Enforce the terms of their

confirmed plan.  On February 21, 2006, the Consolidated Debtors filed an adversary proceeding

against LIICOA and, one day later, filed a Motion for Preliminary Injunction.  Both the Motion

to Enforce and the Motion for Preliminary Injunction sought the same or similar relief to that

requested in the Motion to Modify (i.e., subordination for the FSA loan).  The Court held a

hearing on both Motions on March 1, 2006 and March 3, 2006 and denied each of them after a

lengthy evidentiary hearing.

On March 6, 2006, the Consolidated Debtors with the exception of Mr. George Love,

filed a Motion to Convert the chapter 11 case to one under chapter 7 of the Bankruptcy Code.

The Court held a hearing on the Motion to Convert the same day it was filed, March 6, 2006.  At

6

that hearing, the Court specifically noted that it could not carve Mr. George Love out of an order

converting the case because the case had been substantively consolidated.  In response, counsel

for the Consolidated Debtors amended its Motion to request dismissal rather than conversion.

The Court denied the Motion, finding that the Consolidated Debtors did not have an absolute

right to convert because a chapter 11 plan had been confirmed and also finding that dismissal

would not be in the best interests of creditors.

The next day, George Love Farming, LLC, one of the Consolidated Debtors in the

chapter 11 case, filed the present chapter 7 case.  LIICOA immediately filed an Emergency

Motion to Dismiss the chapter 7 case or, in the alternative, for Relief from the Automatic Stay.

Through the Motion to Dismiss, LIICOA argued that the Debtor had filed this case in bad faith.

In opposition, the Debtor argued that its motivation in filing for chapter 7 relief was to

"wind-up" and preserve assets for a trustee's orderly liquidation of the estate. Specifically, the

Debtor's Memorandum in Opposition to LIICOA's Motion to dismiss stated that "[t]he intent of

this bankruptcy proceeding is to liquidate the Debtor's assets for the benefit of and in the best

interest of all creditors and therefore precludes dismissal under Bankruptcy Code sec. 707."[20]  At

the hearing on LIICOA's Motion, held on March 13, 2006, counsel for the Debtor stated that "it

would not be the intent of George Love Farming to continue to pester the Court with additional

bites at the apple."[21]  Counsel for the present chapter 7 Debtor further stated that "[t]he purpose

is completely different from a Chapter 11 and it's basically an admission that the property needs

---

[20]Debtor's Memorandum in Opposition to Motion to Dismiss at *6, George Love
Farming LC, 06-20612 (Docket No. 9).

[21]Transcript of Oral Argument at 32, March 13, 2006 (Creditor's Exhibit 3).

to be liquidated in favor of all creditors."[22]  Relying in part on these representations, the Court

denied the Motion to Dismiss but continued the Motion for Relief for a final evidentiary hearing.

The Court held a final hearing on the Motion for Relief on April 24, 2006, wherein the

parties submitted evidence including competing appraisal reports and associated testimony.[23]  On

May 10, 2006, the Court issued a Memorandum Decision and Order Denying the Motion for

Relief.

The Memorandum Decision specifically stated that "[t]he other members of the chapter

11 estate did not join in this bankruptcy case, but at the hearing on this matter, they each

represented to the Court that they would agree to be bound by the Court's determination in this

matter."[24]  In connection with that representation, on May 1, 2006, the Debtor filed a Notice of

Debtor's Agreement as to Ownership of Property, signed by the Debtor's counsel ("Debtor's

Notice").[25]  The Notice states that "[t]he Debtor hereby agrees that all interests in and to both of

the foregoing real property are subject to this Court's jurisdiction in this case number 06-20612

and fully subject to the Trustee's legal ownership for administration hereunder."[26]

On May 25, 2006, the chapter 7 Trustee filed a Motion to Sell the Dry Farm free and

---

[22]Transcript of Oral Argument at 34, March 13, 2006 (Creditor's Exhibit 3).

[23]The final hearing on the Motion for Relief was conducted by Judge Tom Cornish, who
certified familiarity with the record pursuant to Bankruptcy Rule 9028.  No parties objected to
Judge Cornish presiding over the hearing.

[24]Memorandum Decision and Order Denying Motion for Relief at * 2, George Love
Farming LC, 06-20612 (Docket No. 49).

[25]Notice of Debtor's Agreement as to Ownership of Property, George Love Farming LC,
06-20612 (Docket No. 40) (Trustee's Exhibit C).

[26]Notice of Debtor's Agreement as to Ownership of Property at ¶ 5, George Love
Farming LC, 06-20612 (Docket No. 40) (Trustee's Exhibit C).

clear of liens and encumbrances under § 363(h). Despite the language discussed above in the

Debtor's Notice, the Debtor and Mr. George Love objected to the proposed sale, arguing that the

Debtor only owned 25% of the Dry Farm. They argued that the remaining 75% interest in the

Dry Farm was held by Mr. George Love, Valayne Love, and Snowville Farms, LLC. These

arguments were also made despite a Relinquishment of Farming Interests filed by Valayne Love

in the chapter 11 case, wherein Valayne Love stated that she "hereby forever relinquishes to the

Chapter 11 Estate. . . all of her right title and interest in any of the following: 1) Snowville Farm,

LLC; 2) George Love Farming Partnership; 3) George Love Farming LC; 4) George Love

Family Partnership; 5) the Love Farming Group; and 6) Any of the assets of the foregoing."[27]

Recognizing that § 363(h) required an adversary proceeding, the Court denied the Trustee's

Motion to Sell without prejudice.

On June 21, 2006, in an apparent effort to avoid the Trustee's sale of the Dry Farm, the

Debtor filed a Motion to Convert Case to Chapter 12. The Debtor failed to schedule the Motion

for a hearing before the Court, however, so the Court did not have occasion to rule on the sought

conversion.

Two days later, on June 28, 2006, the chapter 7 Trustee filed an adversary proceeding

against Mr. George Love, Valayne Love, Snowville Farms, LLC, George Love Family

Partnership and George Love Family Partnership seeking to sell the Dry Farm and the Sanda

Rosa Farm under § 363(h). On July 11, 2006, Mr. George Love, Valayne Love, and Snowville

Farms, LLC conveyed their interest in the Dry Farm to the chapter 7 Trustee, thereby eliminating

---

[27]Valayne Love Relinquishment of Farming Interests, Snowville Farms, LLC, 04-36559
(Docket No. 282) (filed May 16, 2005).

the need for the Trustee to continue with the adversary proceeding as to the Dry Farm.  With
respect to the Sanda Rosa Farm, on October 3, 2006, the Court entered a stipulated judgment in
the adversary proceeding which provides that the chapter 7 Trustee "has authority to sell both the
estate's interest and the interest of any co-owner in the Sanda Rosa farm" (the "Stipulated
Judgment").

With this accomplished, the Trustee filed a Motion to Sell the Dry Farm under § 363(b)
on July 13, 2006.  The Court held a hearing on the Motion to Sell on August 10, 2006 and issued
an Order granting the Motion on the same day.  The Trustee closed on the sale soon thereafter.

On March 8, 2007, the chapter 7 Trustee filed a Motion to Sell the Sanda Rosa Farm.
Four days later, on March 12, 2007, the Trustee filed a Motion for Contempt against George
Love.  The Court held a hearing on the Motion for Contempt on March 15, 2007.  At that
hearing, the parties submitted evidence that the Real Estate Purchase Contract at issue in the
Trustee's Motion to Sell had been breached when Mr. Love began excavating three miles of
PVC pipe from the Sanda Rosa Farm and began moving five pivots from one area of the farm to
another without the knowledge or permission of the Trustee or the Court.  In exchange for
moving the pivots from one area of the farm to another, Mr. Love traded the pipe to the
excavator.  The pipe was collateral for LIICOA's perfected security interest, but Mr. Love did
not inform or obtain its consent for the trade.  Mr. Love testified and argued that he was entitled
to operate the farm business because the Debtor owns only a 25% interest in the Farm and
because he is acting as the principal for the Consolidated Estate, which he stated holds a 75%
interest in the Farm.  After considering the evidence and oral arguments presented, the Court
held that Mr. Love had violated the automatic stay by continuing to operate the Farm after the

10

chapter 7 case was filed and by removing the pipes from the Farm.  The Court noted that the

Trustee had not obtained permission under § 721 of the Bankruptcy Code to operate the

business.[28]

On March 14, 2007, the Debtor filed the present Motion to Convert this case to one under

chapter 11 of the Bankruptcy Code.  The Motion to Convert states that the Debtor is only a 25%

owner of the Sanda Rosa farm with the remaining ownership interest held by the Consolidated

Debtors, and states that the Debtor is allowed a "one-time conversion" absent bad faith.  The

U.S. Trustee, the chapter 7 Trustee, LIICOA, and Barnes Bank each objected to the Motion to

Convert, arguing that it is made in bad faith.

## III.    ANALYSIS

Under §§ 706(a) and (d), a chapter 7 debtor generally has a right to convert to chapter 11

so long as the debtor is eligible to be a debtor under chapter 11, has not previously converted the

case to chapter 7 and is not converting the case in bad faith.[29]

As the U.S. Supreme Court recently held in In re Marrama, a bankruptcy court has

discretion to deny a debtor's motion to convert under § 706(a) if the court finds that the debtor is

attempting to convert in bad faith.[30]  The Marrama Court did not determine what constitutes bad

faith, but stated that, "[i]t suffices to emphasize that the debtor's conduct must, in fact, be

---

[28]After the Court issued its ruling at the hearing on the Trustee's Motion for Sanctions,
the Trustee admitted that the decision to remove the pipe and move the pivots made sound
business sense.  Thus, following the Court's ruling from the bench, the Trustee orally requested
(with the consent of LIICOA) and obtained limited permission under § 721 to finish removing
the pipe and pivots.

[29]Marrama v. Citizens Bank of Mass., — U.S. —, 127 S.Ct. 1105 (2007).

[30]Id. at 1112.

atypical."[31]  The facts of <u>Marrama</u> are instructive, however, since the language of § 706 relates

equally to chapters 11 and 13.  In that case, a chapter 7 debtor filed misleading or inaccurate

statements and schedules which omitted his interest and transfer of his home within 1 year of

filing.[32]  Before attempting to convert the case to chapter 13, the debtor admitted that the purpose

of transferring his home within 1 year of filing was to protect his property from creditors.[33]  On

these facts, the bankruptcy court denied the debtor's motion to convert to chapter 13, and the

Supreme Court affirmed.

There is no specific test in the Tenth Circuit to guide a court's consideration of whether a

Motion to Convert is filed in bad faith under § 706(a).  But in <u>Marrama</u>, the Supreme Court

implied that a court's inquiry should consider factors historically applied to motions to convert

or dismiss.[34]  Courts in the Tenth Circuit look to the following factors in considering whether to

dismiss or convert a chapter 11 case for bad faith:

1) whether the debtor has one asset;
2) whether the debtor's pre-petition conduct has been improper;
3) whether there are only a few unsecured creditors;
4) whether the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court;
5) whether the debtor and one creditor have proceeded to a standstill in a prior forum, and the debtor has lost;
6) whether the filing of the petition effectively allows the debtor to evade court orders;

---

[31]<u>Id.</u> at 1112, n.11.

[32]<u>Id.</u> at 1108.

[33]<u>Id.</u>

[34]<u>Marrama</u>, 127 S.Ct. at 1111 ("In practical effect, a ruling that an individual's Chapter 13 case should be dismissed or converted to Chapter 7 because of prepetition bad-faith conduct, including fraudulent acts committed in an earlier Chapter 7 proceeding, is tantamount to a ruling that the individual does not qualify as a debtor under Chapter 13.").

7)　　　whether the debtor has no ongoing business or employees; and

8)　　　whether there is a lack of possibility for reorganization.[35]

The Court elects to apply the factors listed above, in connection with a totality of circumstances analysis, to this matter.

In determining whether bad faith exists to warrant denial of conversion, courts may consider both pre-petition and post-petition acts.[36]  Thus, a debtor's post-petition actions may combine with pre-petition actions to create a pattern of abuse exhibiting a debtor's attempts to stymie creditors without a desire to repay their claims.[37]  Successive bankruptcy filings do not always create bad faith in a case, but it may infer bad faith in light of other circumstances in the case.[38]

The Debtor argues that to show bad faith, the objecting parties must show some degree of *malum in se*.  The Court disagrees.  Bad faith is a term of art.  Its inquiry can be objective rather than subjective.[39]  Thus, a court may find that a debtor is attempting to convert a case in bad faith based on the totality of circumstances without specifically finding that the debtor's motivation is evil.  The Debtor argues that bad luck and bad decisions do not equate to bad faith.  The Court agrees in part.  Bad luck should not be the sole basis for a finding of bad faith.  But on the other

---

[35]In re Laguna Assoc. Ltd P'ship, 30 F.3d 734, 738 (6th Cir. 1994) (cited by In re Nursery Land Dev., Inc., 91 F.3d 1414, 1416 (10th Cir. 1996)).

[36]See In re Copper, 426 F.3d 810, 813 (6th Cir. 2005).

[37]Id.

[38]In re Young, 237 F.3d 1168, 1174 (10th Cir. 2001); In re Steinacher, 283 B.R. 768 (9th Cir. BAP 2002).

[39]Matter of Elmwood Development Co., 964 F.2d 508, 512 (5th Cir. 1992); In re Muskogee Environmental Conservation Co., 236 B.R. 57, 68 (Bankr. N.D. Okla. 1999).

hand, bad faith generally includes facts which show the a debtor made poor decisions.

At the hearing on this matter, the parties disputed whether the Debtor or the objecting parties have the burden of persuasion to show that the Debtor's Motion to Convert should be denied under <u>Marrama</u>.  After considering oral arguments on this issue, the Court determined that under <u>Marrama</u>, a debtor seeking to convert a case from chapter 7 has an initial burden to show that the debtor has not previously converted the case to chapter 7, and that the debtor is otherwise eligible to be a debtor under the new chapter (in this case, chapter 11).  Once the debtor establishes these requirements, the burden is placed on an objecting party to show that the debtor is attempting to convert the case in bad faith.  In this case, the parties do not dispute that the Debtor in this case has not previously converted this case and that the Debtor is otherwise eligible to be a chapter 11 debtor under § 109 of the Bankruptcy Code.  Thus, the Court should grant the Debtor's Motion to Convert unless the objecting parties can show that the Debtor's Motion is filed in bad faith under <u>Marrama</u>.

Under the circumstances of this case, the Court concludes that the objecting parties have carried their burden to show that the Debtor's attempt to convert this case to chapter 11 is made in bad faith.  Specifically, the Court believes the totality of circumstances in this case shows a pattern of abuse whereby the Debtor has stymied its major secured creditors, LIICOA and Barnes, without a significant intention of repaying creditors.

A.    **Impact of the Order of Substantive Consolidation**

Much of the conduct at issue in this matter relates to the events occurring in the chapter 11 Consolidated Estate.  The Debtor argues that these events are irrelevant in this matter because George Love Farming LC, the debtor in this case, was not a debtor in the chapter 11 case.

14

Counsel points out that although the assets and liabilities of George Love Farming LC were substantively consolidated with the bankruptcy estates of Mr. Love and Snowville Farms, LLC in the chapter 11, it never filed a bankruptcy petition before this case.

After reviewing the record in this case and in the chapter 11 case, the Court concludes that although George Love Farming LC was not originally a debtor in the chapter 11 case, it became a debtor as a result of the Court's Order of Substantive Consolidation.  When a court substantively consolidates bankruptcy estates, the effect is "to pierce the several corporate veils and to disregard the existence of the separate corporate entities."[40]  The result is the creation of "one common pool consisting of assets, liabilities and a single body of creditors, while extinguishing the intercorporate liabilities of the consolidated entities."[41]  Substantive consolidation "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities."[42]  Thus, it has been said that substantive consolidation should be used sparingly because it is a tool "vitally affecting substantive rights."[43]

The Court determines that the Substantive Consolidation Order entered in the chapter 11 case had the desired effect — it substantively consolidated the estates and liabilities of Snowville Farms, LLC, George Love Farming LC, George Love Farming Partnership, George Love Family Partnership and George Love, creating a single debtor with a single set of assets and liabilities (the Consolidated Estate).  Thus, under the case law discussed above the logical conclusion in

---

[40]In re Gulfco Investment Corp., 593 F.2d 921, 928 (10th Cir. 1979); In re Bonham, 229 F.3d 750, 765-66 (9th Cir. 2000).

[41]In re Creditors Service Corp., 195 B.R. 680, 689 (Bankr. S.D. Ohio 1996).

[42]In re Owens Corning, 419 F.3d 195, 205 (3d Cir. 2005).

[43]In re Flora Mir Candy Corp., 432 F.2d 1060, 1062 (2d Cir. 1970).

15

this case is that each debtor became an alter ego for the other as a result of the Consolidation

Order.  So when George Love Farming, LC filed this chapter 7 case, it did so as the alter ego of

the entire Consolidated Estate.  To that end, it appears that the present chapter 7 estate includes

all of the assets and liabilities of the Consolidated Estate because it includes all of the

Consolidated Entities.

In the alternative, the Court concludes there is sufficient evidence in this case to

affirmatively apply the alter ego doctrine to the Debtor, George Love, and the Consolidated

Entities.  A court may disregard a corporate entity under the alter ego doctrine if: 1) there is a

unity of interest and ownership such that the separate personalities of the entities no longer exist;

and 2) if observed, the corporate form would sanction a fraud, promote injustice, or result in an

inequity.[44]  The Court determines that these elements are present in this case.

As discussed in the examiner's Initial Report, the separate personalities of each of the

Consolidated Entities no longer exists.  The examiner's findings as to the relationship between

Mr. Love and his various entities (including George Love Farming LC) are as relevant to this

case as they were in the chapter 11 case.  Also, the Court has seen first-hand how Mr. Love treats

George Love Farming LC and the other Consolidated Entities.  When it benefitted his interests,

he represented to the Court that the Dry Farm and the Sanda Rosa Farm were "fully subject to

the Trustee's legal ownership."[45]  The Court interprets this admission to mean that the estate

owns 100% of the farm properties.  When his interests shifted, however, he argued in opposition

_____

[44]d'Elia v. Rice Development, Inc., 147 P.3d 515, 522 (Utah App. 2006).

[45]Notice of Debtor's Agreement as to Ownership of Property, George Love Farming LC,
06-20612 (Docket No. 40) (admitting that the chapter 7 Trustee has "legal ownership" of the
Sanda Rosa Farm and the Dry Farm).

to the Trustee's Motion to Sell the Dry Farm that the Trustee held title to only 25% of the farm properties. Further, at the hearing on this matter, Mr. Love testified that George Love Farming LC owns approximately $400,000 in cash. When asked where the cash was located, he testified that it was in the chapter 11 debtor in possession account.

The Court also believes that it would be unjust and inequitable to continue recognizing the various separate corporate forms of each of the Consolidated Entities. The administration of this chapter 7 case has been delayed by Mr. Love's indecision as to whether George Love Farming LC owns full title to the farm properties. If the Court continued to respect the various corporate forms of the Consolidated Entities, the Court believes there would be no end to the confusion and delay caused by this indecision. Further, LIICOA and Barnes are secured by the farm properties but have been frustrated in their efforts to exercise their rights in this case and the chapter 11 case because the Debtor continues to argue the distinction between the Consolidated Estate and the current Debtor. At the same time, Mr. Love continues to control the properties (collateral for Barnes and LIICOA) as the purported principal for the Consolidated Estate. This is unfair and inequitable.

Based on the facts of this case, even if the Court had not previously entered its Order of Substantive Consolidation, the Court finds that George Love Farming LC and the Consolidated Entities are alter egos of each other and of Mr. Love himself. Accordingly, the Court believes it appropriate to consider the Consolidated Debtors' actions in the chapter 11 case to determine whether it now seeks to convert this case in bad faith.

The Debtor argues that it is not bound by the statements and admissions contained in the Notice of Debtor's Agreement as to Ownership of Property, even though it was filed and signed

17

by counsel for the Debtor.  Specifically, the Debtor argues that its counsel filed the Notice without Mr. Love's authorization.  In the Tenth Circuit, clients are bound by the admissions and statements of their counsel.[46]  Further, if the admissions and statements in the Notice exceeded the scope of his authority, the Debtor should have brought its concern to the attention of the Court promptly.  The Court is only hearing of the Debtor's disagreement with the statements in the Notice now, ten months after it was filed.

The Debtor also argues that whatever impact the admissions in the Debtor's Notice may have had, it was superceded by the Stipulated Judgment issued in the Trustee's adversary proceeding.  In particular, the Debtor points out that whereas the Debtor's Notice contains the Debtor's admission that the present chapter 7 estate holds full ownership in the Sanda Rosa Farm, the Stipulated Judgment provides for distribution of sale proceeds to George Love, Valayne Love, and Snowville Farms, LLC.  The Court has reviewed the Stipulated Judgment and does not believe that the admissions or statements made by the Debtor in the Debtor's Notice were withdrawn or abrogated.  The Stipulated Judgment does provide for a distribution of proceeds from the sale of the Sanda Rosa Farm and reserves the Debtor's rights to object to a future sale, but it does not impact admissions or statements made by the Debtor in the Debtor's Notice.[47]

### B.    Circumstances of Bad Faith under Tenth Circuit Authority

As discussed above, the Court should determine whether the Debtor seeks conversion in

---

[46]Frank v. Bloom, 634 F.2d 1245, 1521 (10th Cir. 1980).

[47]The Court also notes that the Stipulated Judgment did not purport to alter or amend the Confirmed Plan of Reorganization in the Consolidated Estate, nor was notice of the Judgment provided to creditors of the Consolidated Estate.

bad faith by using a totality of the circumstances analysis which includes the following:

1)    whether the debtor has one asset;
2)    whether the debtor's pre-petition conduct has been improper;
3)    whether there are only a few unsecured creditors;
4)    whether the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court;
5)    whether the debtor and one creditor have proceeded to a standstill in a prior forum, and the debtor has lost;
6)    whether the filing of the petition effectively allows the debtor to evade court orders;
7)    whether the debtor has no ongoing business or employees; and
8)    whether there is a lack of possibility for reorganization.[48]

### 1.    Whether the Debtor Has Few Significant Assets

At the time of filing this case, the Debtor had two significant assets — an interest in the Dry Farm and the Sanda Rosa Farm. Regardless of whether the Debtor owns a full fee simple interest in the farms or only a 25% interest, this case boils down to two major assets. This fact suggests that the Debtor is attempting to convert this case in bad faith.

### 2.    The Debtor's Conduct Pre and Post Petition

The Court believes the Debtor's conduct in the course of this case and during its participation in the chapter 11 case exhibits an intent to manipulate its major secured creditors with the sole motivation of retaining its property at any cost. The Court confirmed a plan of reorganization in the chapter 11 case (which included George Love Farming LC) on November 16, 2006. Soon after substantial consummation of the plan, however, the Consolidated Debtors breached the plan by failing to make the first payments owing to Barnes Bank and LIICOA, two of the major secured creditors in that case. When LIICOA and Barnes sought to exercise their

---

[48]In re Laguna Assoc. Ltd P'ship, 30 F.3d 734, 738 (6th Cir. 1994) (cited by In re Nursery Land Dev., Inc., 91 F.3d 1414, 1416 (10th Cir. 1996)).

rights under the plan of reorganization by scheduling foreclosure sales on the Dry Farm and the

Sanda Rosa Farm, the Consolidated Debtors filed numerous motions to stop the foreclosure.

Over the span of a month, the Consolidated Debtors filed and the Court denied a Motion to

Modify the Plan of Reorganization, a Motion to Enforce the Plan of Reorganization, a Motion to

Convert the case to Chapter 7, and a Motion for Preliminary Injunction.  At the hearings on each

of these Motions, the Consolidated Debtors argued that their primary motivation was to pay all

creditors of the estate rather than just LIICOA.

  The Debtor's actions in the present chapter 7 case exhibit a different motivation,

however.  In objecting to LIICOA's Motion for Relief in this case, the chapter 7 Debtor filed the

Debtor's  Notice, wherein the Debtor agreed that the chapter 7 Trustee had full legal ownership

of the Dry Farm and the Sanda Rosa Farm.  Less than two months later, however, the Debtor

objected to the Trustee's proposed sale of the Dry Farm because it argued that the chapter 7

estate held only a 25% interest in the farm, and promptly filed a Motion to Convert to Chapter

12.

  When the Trustee filed a Motion to Sell the Sanda Rosa Farm, the Debtor's principal

(George Love) caused a breach of the Trustee's Real Estate Purchase Contract by trading away

farm property and relocating pivots which were integral to the sale contract.  When the Trustee

filed a Motion to hold George Love in Contempt, the Debtor filed the present Motion to Convert

to Chapter 11.

  Taken as a whole, the Court does not believe the Debtor is motivated by a desire to pay

creditors.  It appears to the Court that the Debtor desires to retain its farm property at any cost,

regardless of whether its actions negatively or unfairly impact creditors.  To that end, the Court

does not believe the Debtor's conduct throughout this case and the chapter 11 case has been proper.

3.      Whether there are Several Creditors in this Case:

There are at least 19 proofs of claim filed in this case. That said, the filing of this case really represents the Debtor's dispute with two major creditors — LIICOA and Barnes Bank. The Debtor filed this case to stop foreclosure sales scheduled by LIICOA and Barnes under the terms of its chapter 11 plan in the chapter 11 case. LIICOA and Barnes have been the only creditors regularly appearing for hearings in this matter. Thus, the Court believes this consideration is neutral.

4.      Whether the Filing of this Case Followed an attempted Foreclosure and whether the Debtor was Successful in Defending against the Creditor Pre-Petition:

This factor suggests that the Debtor is attempting to convert this case in bad faith. The Debtor filed this case to stop foreclosure sales scheduled by LIICOA and Barnes Bank under the default provisions of the Debtor's confirmed chapter 11 plan in the Consolidated Case. Further, this case was filed only after the Debtor was unsuccessful in avoiding foreclosure through numerous other motions and hearings in the chapter 11 case. In essence, this case represents the Debtor's fifth "bite at the apple" in its attempt to avoid foreclosure.

5.      Whether the Debtor and a Creditor Proceeded to a Standstill in a prior forum and the Debtor Lost:

This factor also suggests that the Debtor is attempting to convert this case in bad faith. As discussed above, the Court held four separate hearings on various motions filed by the Debtor in the chapter 11 case in an attempt to avoid foreclosure. The Debtor was unsuccessful on each of these motions. The Debtor had exhausted its litigation options in the Consolidated Estate.

21

Practically speaking, the Debtor was at a standstill in its fight against LIICOA and Barnes Bank.

Filing this case was the only option remaining to the Debtor to stop LIICOA's foreclosure sale.

      6.     <u>Whether the Filing of this Case Effectively Allowed the Debtor to Evade
Court Orders</u>:

This factor suggests the Debtor is attempting to convert this case in bad faith.  The

Court's Order Confirming the Debtor's Plan of Reorganization in the chapter 11 case covered

both the Debtor's payment schedule as well as the default provisions should the Debtor default

on those payments.  By filing this case, the Debtor deprived LIICOA and Barnes Bank of their

vested and negotiated rights under the confirmed plan.

As an additional consideration, the Court notes that Mr. Love, the Debtor's principal, has

a history of ignoring the automatic stay and Court orders.  Mr. Love's unilateral decision to

excavate and trade away three miles of PVC pipe from the Sanda Rosa Farm and move five

pivots on the property despite his knowledge of the Trustee's Motion to Sell the property and

without permission from the Trustee, LIICOA, or the Court is only one example of the cavalier

manner in which Mr. Love treats property of the estate.  At the hearing on the Trustee's Motion

for Contempt, the Court also heard testimony that Mr. Love liquidated cattle in which the estate

had an interest despite the Trustee's specific instructions to the contrary.  Mr. Love argues that

he had the Trustee's permission to liquidate the cattle.

Further, LIICOA points out that the Debtor and its principal, Mr. Love, have a history of

evading the Court's orders in the Chapter 11 case as well.  LIICOA argues that "the

Consolidated Estate had to be ordered to maintain insurance on the farm properties, had to be

prohibited by Court order from making unauthorized transfers to non-debtor parties, consistently

filed late operating reports, and defaulted on their responsibilities to pay Barnes and LIICOA

22

under the confirmed plan."[49]  Although the evidence on each of these allegations was not as

strong as LIICOA suggests, the Court agrees with LIICOA that the Debtor's overall prior

conduct in the chapter 11 case suggests that the Debtor and its principal have a tendency to not

take Court orders seriously.  This further persuades the Court that the Debtor's attempt to

convert this case is made in bad faith.

       7.     <u>Whether the Debtor has an Ongoing Business or Employees</u>:

Whereas the Debtor has continued to operate the farming business after filing this case,

the Court found in connection with the Trustee's Motion for Contempt that this operation was a

violation of the automatic stay and held that the farming operations must stop.  As of the date of

this Memorandum Decision, the Court has not authorized the operation of the Debtor's business

under § 721 of the Bankruptcy Code.[50]  The fact that the Debtor has continued to operate the

farm business without permission from the Court does not indicate good faith.

       8.     <u>Whether there is a Lack of Possibility for Reorganization</u>:

The Court does not believe it likely that the Debtor could successfully reorganize if

allowed to convert to chapter 11.  The Debtor had a substantial opportunity to reorganize in the

chapter 11 case and defaulted before making its first few payments owing under the plan.  It is

difficult to see how the result would be different in another chapter 11 case.

At the hearing on this matter, Mr. Love testified that the only cash available to the Debtor

---

[49]LIICOA's Objection to Debtor's Motion to Convert to Chapter 11 at ¶ 38.

[50]At the conclusion of the hearing on the Trustee's Motion for Contempt, the Court did
authorize the Trustee to operate the farm business in a very limited capacity to allow the
completion of the project relating to removing the pipe and moving the pivots.  The Court
specifically stated that it was granting the Trustee limited permission only, and that no other
farm operations were authorized without further permission from the Court under § 721.

are funds in the chapter 11 Consolidated Estate's debtor in possession account.  He testified that

if this case were converted to chapter 11, it would likely be funded by a gift made by one of his

other non-debtor companies.  In light of this testimony, the U.S. Trustee and LIICOA argue that

the Debtor has not provided a sufficient basis to explain how it plans to reorganize with the

Sanda Rosa property only.

The Court is persuaded that if the Debtor could not successfully reorganize with both

farm properties in the Consolidated Estate, it is unlikely the Debtor could reorganize now with

only the Sanda Rosa property and fewer funds on hand.

9.      Motivation and Sincerity of the Debtor:

In addition to the eight factors discussed above, the Court also believes that the Debtor's

stated motivation and sincerity in seeking to convert this case is relevant to whether conversion

is sought in bad faith.  At the hearing on this matter, the Debtor argued and Mr. Love testified

that its sole motivation in converting this case is to obtain a greater return for unsecured

creditors.  Mr. Love testified that he believes the chapter 7 Trustee's Motion to Sell the Sanda

Rosa Farm proposes to sell the property for an insufficient amount.  He further testified that he

believes he can obtain a greater return for unsecured creditors by operating the farm business and

possibly selling smaller parcels of the Sanda Rosa Farm.  This testimony is similar to the

Debtor's reason for filing this chapter 7 case last year, where he argued against dismissal at the

hearing on LIICOA's Motion to Dismiss on March 13, 2006.  In responding to LIICOA's

Motion to Dismiss, the Debtor argued that its sole motivation in filing for chapter 7 relief was to

avoid foreclosure and obtain an orderly distribution to all creditors of the estate.[51]  There too, Mr.

---

[51]Objection to Motion to Dismiss and Motion for Relief from Stay, Docket No. 9.

24

Love testified that his sole motivation in filing this case was to repay his creditors.  Indeed,

counsel for the Debtor stated at the hearing on LIICOA's Motion to Dismiss that "[t]he purpose

is completely different from a Chapter 11 and it's basically an admission that the property needs

to be liquidated in favor of all creditors."[52]

The Court does not believe that the Debtor's true motivation in seeking to convert this

case is to repay creditors.  When the Debtor filed for chapter 7 relief, it stated that its main goal

was to obtain the benefits of a chapter 7 Trustee.  Now that the Trustee is doing his job and

liquidating assets of the estate, the Debtor is seeking to convert this case to chapter 11.  The

stated motivation for seeking to convert at this time does not seem genuine to the Court.  Further,

the Court does not believe Mr. Love to be a credible witness.  He often does not answer

questions directly and his memory of major events in this case changes depending on the matter

at hand.  At times, he did not recall details relating to significant events in this case but he did

remember specific details regarding numbers and other minutia.

The Debtor argues that the Court should not give credence to the arguments made by the

chapter 7 Trustee.  Specifically, the Debtor argued that the chapter 7 Trustee is motivated by a

desire to obtain payment for selling the Sanda Rosa Farm.  The Debtor argues that it is the only

party attempting to protect unsecured creditors in this case because the sale proposed by the

Trustee for the Sanda Rosa Farm would not provide a return for unsecured creditors.  To the

contrary, the Court finds the Trustee's opposition to the Motion to Convert persuasive in this

case.  Chapter 7 Trustees are tasked with a host of responsibilities which include the

investigation of the financial affairs of the debtor, opposing a debtor's discharge if advisable, and

---

[52]Transcript of Oral Argument at 34, March 13, 2006 (Creditor's Exhibit 3).

making distributions to creditors under a final report.[53]  In conducting these responsibilities, a

chapter 7 Trustee is also considered a representative of the interests of creditors.[54]  In light of all

these responsibilities, the Trustee cannot be said to act in his own personal interests simply

because he advocates a sale which would not pay unsecured creditors.  In addition, the Court

notes that there are other assets aside from the farm properties which could be liquidated by the

Trustee to pay unsecured creditors in this case.  His objection to the Motion to Convert appears

entirely appropriate to the Court and the Trustee's concerns should be taken seriously absent a

clear showing of abuse of discretion.[55]

        In light of the above nine factors and the totality of circumstances in this case, the Court

determines that the Debtor is attempting to convert the case to chapter 11 in bad faith.  The

totality of circumstances indicates a pattern of behavior whereby the Debtor has manipulated the

provisions of the Bankruptcy Code and hindered the rights of its principal secured creditors in an

effort to retain its farming property at any cost.  Further, the Court does not believe the Debtor is

likely to be successful in another chapter 11 case when it was unsuccessful in the former chapter

11 case and with Mr. Love acting as its principal.  Converting this case to chapter 11 is likely to

further hinder and delay creditors and would halt the Trustee's attempt to sell property of the

estate.  The Court specifically finds that this Debtor is the "atypical" debtor discussed in

Marrama. Accordingly, the Court elects to exercise its discretion under § 105(a) and Marrama to

deny the Debtor's Motion to Convert to chapter 11.

---

        [53]See 11 U.S.C.A. § 704(a).

        [54]Koch Refining v. Farmers Union Cent. Exchange, Inc., 831 F.2d 1339, 1342-43 (7th
Cir. 1987).

        [55]See In re Curlew Valley Assoc., 14 B.R. 506 (Bankr. D. Utah 1981).

## IV.    CONCLUSION

The Debtor's Motion to Convert to Chapter 11 should be denied.  A separate Order

accompanies this Memorandum Decision.



Service of the foregoing **MEMORANDUM DECISION DENYING DEBTOR'S MOTION TO CONVERT** will be effected through the Bankruptcy Noticing Center to each party listed below.

All parties listed on the mailing matrix in this case.

All parties listed on the mailing matrix in Bankruptcy Case No. 04-36559.

Joel Marker
Jeremy Sink
McKay Burton & Thurman
170 South Main Street, Suite 800
Salt Lake City, UT 84101

Cy Castle
Peter Kuhn
U.S. Trustees Office
Ken Garff Building
405 South Main Street, Suite 300
Salt Lake City, UT 84111

M. Robert Smith
31 Federal Avenue
Logan, UT 84321

Paul Toscano
Boston Building, Suite 419
9 Exchange Place
Salt Lake City, UT 84111

Russell Walker
Woodbury & Kesler
265 East 100 South, Suite 300
P.O. Box 3358
Salt Lake City, UT 84110-3358

Kim Wilson
Snow, Christensen & Martineau
10 Exchange Place, 11th Floor
P.O. Box 45000
Salt Lake City, UT 84145

Gary Jubber
Fabian & Clendenin
215 South State Street
12th Floor
P.O. Box 510210
Salt Lake City, UT 84151

Danny Kelly
Brandy Sargent
Stoel Rives
201 South Main Street, Suite 1100
Salt Lake City, UT 84111